**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

CRYSTAL GUTIERREZ,
                    Plaintiff,

v.                                                              No. 5:17-cv-01233-JKP

CITY OF CONVERSE AND ITS FIRE
DEPARTMENT,
                    Defendant.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court upon Defendant City of Converse's Motion for Summary

Judgment (ECF No. 21). Plaintiff Crystal Gutierrez filed an opposition to said motion and

Defendant filed a reply thereto (ECF Nos. 28, 30). After careful consideration of the arguments

and evidence of the parties, the Court grants in part and denies without prejudice in part

Defendant City of Converse's Motion for Summary Judgment (ECF No. 21). Plaintiff Crystal

Gutierrez's claims for discrimination and retaliation brought pursuant to Title VII, the Americans

with Disabilities Act, and the Texas Commission on Human Rights Act are dismissed.

Defendant's motion for summary judgment on Plaintiff's Equal Pay Act claim is denied without

prejudice.

## I. BACKGROUND

On April 21, 2009, Crystal Gutierrez ("Gutierrez") was hired by The City of Converse

Fire Department as an EMT/Paramedic.[1] She became a Firefighter one year later. On June 26,

2016, while serving as backup to an Acadian Ambulance crew, Gutierrez left the scene of a

critically ill patient without being cleared to do so. A member of the Acadian crew filed a

---

[1] Plaintiff's Complaint names and the docket reflects "The City of Converse and its Fire Department" as a single defendant. No party in this case has asserted that the Fire Department is a legal entity separate from the City capable of being sued. Accordingly, the Court treats the captioned Defendant as a single defendant.

complaint against Gutierrez as did the daughter of the now-deceased critically ill patient, each complaining about Gutierrez's conduct at the scene. Following an investigation conducted by Lt. Robert Avella of the Converse City Police Department, Gutierrez was fired on December 15, 2016.

In this lawsuit, filed December 4, 2017, Gutierrez asserts the City violated Title VII of the Civil Rights Act and the Texas Labor Code § 21.051, *et seq.* when it discriminated and retaliated against her by terminating her employment after she complained of harassment based on her sex and disability. ECF No. 1. Gutierrez also alleges a violation of the Equal Pay Act. *Id*. The City of Converse ("the City") moves for summary judgment contending (1) Gutierrez fails to make a prima facie case of discrimination based on sex or disability and fails to present sufficient evidence that the City's reason for discharging her was pretextual; (2) Gutierrez fails to establish a prima facie case of retaliation and fails to produce evidence sufficient to rebut the City's legitimate non-retaliatory reason for her termination; (3) Gutierrez and her male colleagues were paid on equal terms. ECF No. 21 at 7-13.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[2] A dispute is "genuine" where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id*. at 249. A dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Id*. at 248. While all evidence

---

[2] Although 2010 amendments replaced "issue" with "dispute," the summary judgment standard "remains unchanged." Fed. R. Civ. P. 56 advisory committee notes (2010 amend.).

and reasonable inferences are viewed in the light most favorable to the nonmovant, and all disputed facts are resolved in favor of the nonmovant, the judge's function "is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Anderson*, 477 U.S. at 249).

The moving party has the burden to "demonstrate the absence of a genuine issue of material fact and the appropriateness of judgment as a matter of law" to prevail on its motion. *Union Planters Nat'l Leasing v. Woods*, 687 F.2d 117, 121 (5th Cir. 1982). Once the moving party has met its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Anderson*, 477 U.S. at 252 (stating that "a scintilla of evidence" is insufficient). A court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)). Rather, the nonmoving party must identify specific facts that show a genuine dispute for trial. *Matsushita*, 475 U.S. at 587. The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

"A district court's decision on summary judgment is largely controlled by what the parties presented. If somewhere in a record there is evidence that might show a dispute of material fact, the district court needs to be pointed to that evidence as opposed to having to

engage in an extensive search." *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) (citations omitted). It is the nonmovants duty to identify evidence in the record that establishes the existence of a genuine dispute of material fact. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). When the nonmovant fails to cite or refer to evidence that exists in the summary judgment record, "that evidence is not properly before the district court." *Id.* Where the nonmovant fails to meet its duty to identify evidence in the record to support its assertions, a court may conclude it has failed to raise a genuine dispute of material fact on that particular issue. *Holmes v. N. Texas Health Care Laundry Coop. Ass'n*, 304 F. Supp. 3d 525, 540 (N.D. Tex. 2018).

## III. DISCUSSION

### A. Rule 30(b)(6)

Gutierrez purports to object to the testimony of the corporate representatives produced by the City. ECF No. 28 at 4, 11.[3] Gutierrez complains that Assistant Chief Christian ("Christian") was produced to testify about the investigation that led to Gutierrez's termination, but Christian testified that he was not involved in the investigation. *Id.* at 12. Gutierrez moves the Court to therefore disregard all evidence presented with respect to the investigation and her termination, accept her assertion that "the reasons and support for the termination were false," and deny summary judgment. *Id.* at 4 ¶ 7; 11-15. Gutierrez also objects to Human Resources Director John Rudd's ("Rudd") testimony. *Id.* at 15. Having read the deposition testimony of each witness, the Court does not find that any of the witnesses were unprepared to testify upon the questions posed. Accordingly, the objection is denied.

---

[3] Gutierrez's response states: "Plaintiff has filed a separate objection to the declaration and deposition testimony and has filed a motion for summary judgment and to exclude testimony (Dkt 39), which is incorporated herein for all purposes." ECF No. 28 at 4. No such separate motion is before this court. Further, the terminal docket number prior to the filing of this Memorandum Opinion was 32.

**B. Equal Pay Act**

The Equal Pay Act ("EPA") added to "the Fair Labor Standards Act of 1938 the principle of equal pay for equal work regardless of sex." *Corning Glass Works v. Brennan*, 417 U.S. 188, 190 (1974). To establish a prima facie case under the EPA, a plaintiff must show: "1. her employer is subject to the Act; 2. she performed work in a position requiring equal skill, effort, and responsibility under similar working conditions; and 3. she was paid less than the employee of the opposite sex providing the basis of comparison." *Chance v. Rice Univ.*, 984 F.2d 151, 153 (5th Cir. 1993). Once a plaintiff meets this threshold, the burden shifts to the employer to prove that the differential is indisputably justified under one of the Act's four exceptions. *Plemer v. Parsons-Gilbane*, 713 F.2d 1127, 1136 (5th Cir. 1983) (quoting *Corning Glass*, 417 U.S. at 196). These exceptions are: "(i) a seniority system, (ii) a merit system, (iii) a system which measures earnings by quantity or quality of production, or (iv) a differential based on any other factor than sex." *Id.* at 1132 (quoting 29 U.S.C. § 206(d)).

Gutierrez alleges she was paid "unequal compensation based upon her sex in comparison to her male counterparts." ECF No. 1 ¶ 62. Pointing to the deposition of City Manager LeAnn Piatt, the City contends Gutierrez was not paid less than members of the opposite sex. ECF No. 21 at 12. City Manager Piatt testified that in 2016, the City implemented the "Werling study." ECF No. 21-2 at 10. As part of this implementation, "each individual employee was evaluated based on their education, based on their experience, and were given a raise. Everybody was brought to the minimum because we were below minimum." *Id.* at 12. This meant that all "firefighter paramedic EMT-P's [including Gutierrez] were brought up to 15.99." *Id.* at 13.

The summary judgment evidence shows Gutierrez was better paid than her male peers with the exception of one: Eric Brightsen. *See Harris v. Auxilium Pharm., Inc.*, for a brief

discussion as to whether a plaintiff must demonstrate she was paid less than every male, or whether it is sufficient to show she was paid less than some or only one male peer, 664 F. Supp. 2d 711, 729 (S.D. Tex. 2009). On this question, a sister court concludes, "the plaintiff need not prove that she was paid less than every comparable male employee. . . . It is enough for the plaintiff to show that there is discrimination in pay with respect to one employee of the opposite sex." *Lenihan v. Boeing Co.*, 994 F. Supp. 776, 799 (S.D. Tex. 1998) (citing *Merrill v. Cintas Corp.*, 941 F. Supp. 1040, 1044 n.4 (D. Kan. 1996); *EEOC v. White & Son Enter.*, 881 F.2d 1006, 1009 (11th Cir. 1989)).

Gutierrez and Eric Brightsen were hired April 21 and June 29, 2009 respectively. ECF No. 21-1 at 215-16. For the five years preceding Gutierrez's termination their pay rates were:

|  | Dec. 2016 | Dec. 2015 | Dec. 2014 | Dec. 2013 | Dec. 2012 |
|---|---|---|---|---|---|
| Brightsen | 16.20 | 15.88 | 15.03 | 14.69 | 13.83 |
| Gutierrez | 15.99 | 15.24 | 14.52 | 14.10 | 13.25 |

*Id.* To prevail on summary judgment the City must present evidence that justifies the pay differential between Brightsen and Gutierrez. *See* 29 U.S.C. § 206(d).

Because a genuine dispute of material fact exists regarding the difference in pay between Gutierrez and Brightsen, the Court denies the City's Motion on Gutierrez's Equal Pay Act claim.

## C. Discrimination Claims

Title VII cases are conducted under a burden-shifting framework developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). In a Title VII case, plaintiffs must first establish a prima facie case of discrimination. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981). The burden then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse action. *Id.* The burden then shifts back to

the plaintiff to establish that the legitimate reasons offered were not the true reasons, but merely pretext for discrimination. *Id.* "Because the [Texas Commission on Human Rights Act] is the state counterpart to Title VII, the same standards apply." *Martin v. Kroger Co.*, 65 F. Supp. 2d 516, 530 (S.D. Tex. 1999) (quoting *Allison v. City of Fort Worth*, 60 F. Supp. 2d 589, 593 (N.D. Tex. 1999)) (citing *Farrington v. Sysco Food Servs., Inc.*, 865 S.W.2d 247, 251 (Tex. App.— Houston [1st Dist.] 1993, writ denied); *Schroeder v. Texas Iron Works, Inc.*, 813 S.W.2d 483, 485 (Tex. 1991)).

**1. Sex Discrimination**

A prima facie case of workplace discrimination "requires a showing that the plaintiff (1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group." *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007) (citing *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405 (5th Cir. 2005)). "In work rule violation cases, a Title VII plaintiff may establish a prima facie case by showing either (1) that she did not violate the rule or (2) that if she did, other employees who engaged in similar acts were not punished similarly." *Turner v. Kansas City Southern Railway Company*, 675 F.3d 887, 892-93 (5th Cir. 2010).

The City argues that Gutierrez cannot establish that other similarly situated employees outside the class were treated more favorably under nearly identical circumstances nor can she establish that other employees who engaged in similar acts were not punished similarly.

**a. More favorable treatment**

In her Declaration, Gutierrez offers several comparators who she contends were treated

more favorably. ECF No. 28-7 at 6, 11. An employee who proffers a fellow employee as a comparator must demonstrate that the employment actions at issue were taken "under nearly identical circumstances." *Lee v. Kan. City S. Ry. Co*, 574 F.3d 253, 260 (5th Cir. 2009).

> The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories. And, critically, the plaintiff's conduct that drew the adverse employment decision must have been "nearly identical" to that of the proffered comparator who allegedly drew dissimilar employment decisions. If the "difference between the plaintiff's conduct and that of those alleged to be similarly situated *accounts for* the difference in treatment received from the employer," the employees are not similarly situated for the purposes of an employment discrimination analysis.

*Id*. (internal citations omitted; emphasis in original).

Gutierrez first names Paul Kendzior, stating: "During his probationary status he was accused of domestic violence. He was allowed to remain on duty as a firefighter and was forbidden to have any patient contact." ECF No. 28-7 at 6. Paul Kendzior fails as a comparator because his alleged conduct is different than the conduct for which Gutierrez was sanctioned during her tenure with the City of Converse Fire Department. Paul Kendzior's alleged conduct took place outside the workplace. Each of the incidents for which Gutierrez was disciplined occurred at work, during work hours, to wit: (1) falsifying medical information on a patient run form, ECF No. 21-3 at 12-13, 82; (2) an altercation with a colleague, *id*. at 15-16, 84; and (3) misconduct including refusing to assist the crew of another ambulance; leaving the scene of a critically ill patient without being cleared to do so; and showing a lack of compassion and professionalism. *Id*. at 121.

Gutierrez next proffers "John Carlile and Heather Franklin- Incident involving an error in which, a medication was given to a patient, via the wrong route. Neither was subjected to

administrative leave or termination." ECF No. 28-7 at 6. John Carlile and Heather Franklin fail as comparators because their conduct involved giving medication in error. Gutierrez did not commit an error regarding medication; she was disciplined for intentionally falsifying the dose of medication given to a patient. *See* ECF No. 21-3 at 12-13, 82. The conduct for which she was terminated also involved intentional actions, which included leaving the scene of a critically ill patient without being cleared to do so. ECF No. 21-3 at 48-50 (Gutierrez Dep. 47:2-49:11).

Gutierrez also proffers "Lt. Carlos Cardec [who] has been under investigation since July 2015 for allegations of misconduct. He has been allowed to be on duty during his investigation." ECF No. 28-7 at 11. Because Gutierrez does not allege she has the same job or responsibilities as a Lieutenant, Lt. Carlos Cardec fails as a comparator. Gutierrez also fails to establish that she and Lt. Cardec have been "under investigation" for essentially the same violations.

Gutierrez next proffers that "Corde Armstrong openly discussed my case with members of the fire department. Corde has openly discriminated against me, and the integrity of my investigation was compromised by his actions. He was never subjected to an investigation." ECF No. 28-7 at 11. Corde Armstrong was terminated after he was seriously injured in an altercation with another employee. *See* ECF No. 21-1 at 43-44 (Rudd Dep. 42:7 – 43:7). Consequently, he was not treated more favorably than Gutierrez. Also, the conduct that Gutierrez attributes to Mr. Armstrong in her example is not nearly identical to the conduct that drew her termination, as Gutierrez has not alleged she openly discriminated against her co-workers or compromised the investigation of a fellow FF/EMT-P.

Gutierrez also proffers Delmiro Soliz who "missed multiple calls for service because he was working out while on duty. Delmiro was never subjected to disciplinary actions or an investigation for failing to respond for calls of duty." ECF No. 28-7 at 11. Here again, the

alleged conduct appears to differ from Gutierrez's conduct because Gutierrez intentionally left the scene of a critically ill patient without being cleared to do so. ECF No. 21-3 at 48-50 (Gutierrez Dep. 47:2 – 49:11). Gutierrez's description of Soliz's conduct does not indicate that Soliz's alleged actions or inactions were intentional.

Finally, Gutierrez submits that Jose Perez "[g]ave a patient too much medication during a call. I was his partner during the call. He is the same level certification as myself. Although I did not physically give the pain medication, I was subjected to the same punishment." ECF No. 28-7 at 6. Because Gutierrez's proffered incident is different than the incident which led to her termination, Jose Perez fails as a comparator. During the June 26, 2016 incident that precipitated her termination, Gutierrez's partner was not present and had no knowledge about what transpired inside the patient's home. ECF No. 21-3 at 70 (Gutierrez Dep. 69:16 – 70:1). In Gutierrez's example, she does not allege that she had no knowledge that Perez had given too much medication. Secondly, as a basic EMT, Gutierrez's partner at the June 26, 2016 incident was subordinate to Gutierrez. *Id.* Perez and Gutierrez were the same certification level. *Id.*

Based on the proffered comparators, Gutierrez cannot establish an essential element of her prima facie case: that a similarly situated employee was treated more favorably under nearly identical circumstances. *Lee*, 574 F.3d 253, 260 (5th Cir. 2009).

**b. Violation of policy**

Gutierrez argues there was no policy against leaving a scene without being cleared to do so, stating, "there was no known policy violation." ECF No. 28 at 8. Gutierrez states that Captain Craig Ramon ("Ramon") testified that "there was no City policy that prohibited Ms. Gutierrez from leaving the scene after her dispute with the Acadia crew. There was not a city policy that covered that." ECF No. 28 at 10. She further represents that Ramon "stated that under State

policy, because she handed off the patient to the primary ambulance crew, there was no violation of State regulations." *Id*. And, Gutierrez argues, because Ramon's "testimony was supported by both the findings of the police investigation and findings of the state[,] [t]here was no violation on which the City's termination could be supported." *Id*.

Gutierrez admits the Acadian Ambulance crew was the primary crew in charge of the scene. ECF No. 21-3 at 45 (Gutierrez Dep. 44:11-22). Gutierrez admits she left the scene without being cleared to do so. *Id*. at 46-50 (Gutierrez Dep. 45:21 – 49:11). The City of Converse Policy Handbook contains the following policy: "City of Converse Policy 17.10.2 Walking off the job without prior approval from the employee's immediate supervisor or person in charge will be considered a voluntary resignation, and the employee shall be terminated from employment for 'job abandonment.'" ECF No. 21-1 at 141. In his termination memorandum, Chief Wendt cites the following policies violated by Gutierrez at the June 26, 2016 incident:

> 1. Acts which are not specifically addressed in policies and procedures, codes of conduct, and rules and regulations, yet which may adversely affect the City or put the health and safety or fellow employees, citizens or other third parties, at risk, may also result in disciplinary action. 14.07.2.
>
> 2. Failing to exercise diligence in carrying out all assignments and duties. 14.07.3.6.
>
> 3. Unsatisfactory performance or conduct. 14.07.3.19.
>
> 4. Inefficiency, incompetence or neglect of duty. 14.07.3.20.
>
> 5. Insubordination or other disrespectful or unprofessional conduct. 14.07.3.25.
>
> 6. Discourteous treatment of the public or co-worker. 14.07.3.26.

ECF No. 21-3 at 122.

The summary judgment evidence reflects that the City had a policy that governed Gutierrez's conduct on June 26, 2016. *Id.* The City determined and Gutierrez admitted that she

left the scene without being cleared to do so. *Id.* at 48-50, 122. It is also undisputed that the patient died after arriving at the hospital and the patient's family filed a complaint against Gutierrez. ECF No. 21-1 at 196. Consequently, as documented in its termination memorandum, the City found that Gutierrez violated City policy and terminated her on that basis. Therefore, Gutierrez cannot establish an essential element of her prima facie case: that she did not violate a rule. *Turner*, 675 F.3d 887, 892-93.

**c. Similar punishment**

Gutierrez contends Jordan Marroquin, her partner on June 26, 2016, was not punished similarly because he was neither investigated nor disciplined for the incident. The evidence shows Gutierrez's partner at the June 26, 2016 incident was not punished similarly because he was not privy to the events inside the home and, therefore, not subject to discipline.

In support of her argument that Marroquin was not punished similarly, Gutierrez again offers the testimony of Captain Ramon who testified that Jordan Marroquin was not disciplined. ECF No. 28-2 at 10 (Ramon Dep. 29:17-19). Ramon further testified if Marroquin "had no knowledge of what transpired prior to [Gutierrez] coming out and saying, 'We're leaving,' there would be no cause to discipline him." ECF No. 28-2 at 14 (Ramon Dep. 43:11-23). On the other hand, if Marroquin "was part of the decision to leave" "was aware of the same thing [Gutierrez] was aware of," then Marroquin would be subject to discipline as well. *Id.* (Ramon Dep. 43:25 – 44:1-8).

Gutierrez testified about Marroquin's role on June 26, 2016, stating:

A. I walked out to the garage and I told my partner what was going on, and he shook his head.
Q. He never had gone inside the house, had he?
A. No.
Q. Did anyone clear you to leave?
A. No.

Q. But you left anyway?
A. I did.
. . . .

Q. Do you agree with Kyndall Warren's version of events?
A. No.
Q. What do you disagree with?
A. Everything.
Q. And by everything, could you indicate specific areas where she's incorrect or you disagree?
A. Jordon [Marroquin] never told her that we can't get him—we can't get the stretcher in there. That was what I said because my partner never ever went inside. Never. He never acted in his capacity as a basic at all.

ECF No. 21-3 at 70 (Gutierrez Dep. 69:16 – 70:1). Gutierrez's testimony makes clear Marroquin had no knowledge of what transpired prior to Gutierrez coming out of the house because Marroquin "never ever went inside." *Id*. Consequently, "there would be no cause to discipline him." ECF No. 28-2 at 14 (Ramon Dep. 43:11-23).

Establishing a prima facie case for a work rule violation requires Gutierrez to establish that another employee who engaged in a similar act was not punished similarly. Because Marroquin never entered the home and had no knowledge of what transpired inside the home, Gutierrez has not established that Marroquin engaged in a similar act. Gutierrez cannot, therefore, establish an essential element of her prima facie case: that other employees who engaged in similar acts were not punished similarly. *Turner*, 675 F.3d at 892-93 (5th Cir. 2010).

Gutierrez can point to no evidence that establishes she did not violate a rule or that other employees who engaged in similar acts were not punished similarly, nor can she establish she was treated less favorably than other similarly situated employees. Accordingly, the Court finds the City is entitled to summary judgment on Gutierrez's sex discrimination claim.

**2. Disability Discrimination**

To make a prima facie case of discrimination under the ADA, a plaintiff must show "(1)

[s]he has a disability or was regarded as disabled; (2) [s]he was qualified for the job; and (3) [s]he was subject to an adverse employment decision because of [her] disability." *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 341 (5th Cir. 2019) (citing *Williams v. J.B. Hunt Transp., Inc.*, 826 F.3d 806, 811 (5th Cir. 2016)).

The City contends Gutierrez cannot establish a nexus between any alleged disability and her termination. ECF No. 21 at 10. Gutierrez makes no effort to establish a prima facie case. The Court's examination of Gutierrez's Response finds four points: (1) when she returned to work after the Chiari decompression surgery, she was placed on the "A" Shift as opposed to being placed back on the "B" Shift where she had been prior to her surgery; (2) after she went to the E.R. for an issue related to her medical condition, Chief Wendt informed her "'the people down the street' are requesting a fitness for duty test;" (3) while on duty at a structure fire, co-worker Corde Armstrong commented, "How does it feel to not be able to do your job?"; (4) a co-worker was not "subjected to a fitness for duty exam" after a surgery. ECF Nos. 28 at 3; 28-7 at 3-4 (Gutierrez Declaration).

As to her first point, Gutierrez was diagnosed with Chiari 1 Malformation in August 2015 and had Chiari decompression surgery October 14, 2015. ECF No. 28-7 at 2-3. Gutierrez returned to light duty on November 12, 2015. *Id.* at 3. In December 2015, Gutierrez's physician cleared her to return to work as a paramedic. *Id.* Gutierrez was temporarily assigned to "A" Shift. *Id.* Gutierrez contends "A" Shift was a hostile work environment and her PTSD counselor "did not think [her] work situation was conducive to the healing process for job related PTSD." *Id.* Ramon testified he spoke to Chief Wendt about Gutierrez returning to "A" Shift "because he had asked me how I felt about her coming back to my shift, which I responded, you know, whatever the Department needs. I said, 'But are you going to put her back on that shift when she was

14

removed under doctor's orders from that shift?' And he said, 'Yes, I am.'" "So, he moved her and said it would be temporary, and she never came back to my shift." ECF No. 28-2 at 6 (Ramon Dep. 10:1-6, 12-13).

During her tenure with Converse City Fire Department Gutierrez moved between "A" shift and "B" Shift several times. *See* ECF No. 28-2 at 5-9. One such move from "B" Shift to "A" Shift was made in an effort to keep Gutierrez after she submitted a letter of resignation. Captain Ramon testified he held on to her letter of resignation but "[a]t 8:00 o'clock the next morning, the station phone rang. I answered it, it was her. She asked if I had submitted her letter of resignation to the City. I said, 'No, I didn't.' I thought she'd cool down, and we would talk about this."

> And she said, "I want you to submit it right now. "So, I went next door and I submitted it to the Chief. And he said, "Okay. Well, she quits, she quits." And by 1:00 o'clock that afternoon, I was being advised by another employee of mine, . . . "Hey, they're moving Crystal Gutierrez to 'A' shift."

> I said, "What do you mean they're moving her to 'A' shift? She quit." "I just got off the phone with her, man. She's going to 'A' shift." So, I contacted the Chief by telephone. I asked him, "Are you moving Crystal Gutierrez?"

> He said, "Yeah. I'm going to move her. You know, basically, just doing this, sometimes people get along better on other shifts, maybe it will work out. The rest of your shift seems to have it going on. So, we'll move her. We'll let y'all keep doing what you're doing."

ECF No. 28-2 at 8-9 (Ramon Dep. 20:20 – 24:7). Gutierrez's 2014 complaint ("complaint") states that after an altercation with co-worker Soliz in October 2012, she was told a move off "A" Shift "was not an option due to staffing." ECF No. 21-3 at 93. Gutierrez's complaint states the maximum personnel per shift was ten. *Id*. According to a chart in the complaint, there were eight employees, including herself, on "A" Shift, nine employees on "B" Shift, and nine employees on "C" Shift. *Id*. The complaint indicates Gutierrez was on "A" Shift from 2012 until

May 2014 when she moved to "B" Shift.

Captain Ramon testifies: "To just kind of give a timeline history, she had worked for me [on "B" Shift] and then moved to "A" shift, and there was an incident that occurred, which caused the Chief to move her to "A" shift [described above]. And then, she requested, or was seeing a doctor for PTSD, at which time, the doctor would not clear her back to work unless she was removed from that shift. And that's when she was placed back onto my shift, on "B" shift. So, she was moved off "A" shift back onto "B" shift." ECF No. 28-2 at 5 (Ramon Dep. 9:5-25).

Consequently, the Court finds no evidence to support Gutierrez's inference that being assigned to "A" Shift rather than back on "B" Shift after her surgery demonstrates that she was terminated because of a disability. *See Nall*, 917 F.3d at 341 (a prima facie case must show the complainant "was subject to an adverse employment decision because of [her] disability").

With respect to Gutierrez's second point—regarding a fitness for duty test—Gutierrez states that in March 2016, her "restrictions were removed in their entirety," ECF No. 28 ¶¶ 5, 9-13, but on March 30, 2016, following "an incident" "in which [Gutierrez] had to leave work and go to the E.R. for a symptom related to her medical condition," H.R. Director John Rudd discussed with Fire Chief Richard Wendt and Assistant Chief Ray Christian "the possible need to obtain a Fitness for Duty Report from her physician." ECF No. 21-1 at 242. Gutierrez asserts in April 2016, she "had a flare up of symptoms while off duty, resulting in a day in the hospital" and when she returned to work, "Chief Wendt informed her that 'the people down the street' are requesting a fitness for duty test." ECF Nos. 28 at 20; 28-7 at 4.

The City of Converse Policy Handbook provides: "35.08 An employee who misses work due to medical reasons may be required to provide, before returning to work, (a) a doctor's note or report, or (b) a fitness-for-duty certification. ECF No. 21-1 at 161. Consequently, a request for

a fitness for duty certification after an emergency room visit is consistent with the City's policy. It is also consistent with Fifth Circuit precedent, which holds that "the ADA permits medical inquiries upon an employee's request to return to work" particularly where there is a "reasonable concern about the employee's ability to perform essential job functions or that the employee will pose a direct threat because of a medical condition." *Diggs v. Burlington N. & Santa Fe Ry.*, 742 F. App'x 1, 3-4 (5th Cir. 2018).

Gutierrez's third point—that she complained of disability discrimination based on a comment by a co-worker, to wit: "How does it feel to not be able to do your job?"—is discussed in more detail below. In short, Gutierrez alleges this comment was made in February 2016. She did not register a complaint about the alleged comment until her pre-disciplinary meeting on November 22, 2016. After receiving the complaint and prior to terminating Gutierrez, an investigation was made in which the co-worker strenuously objected to both the quotation and characterization of his comment. *See* ECF No. 21-1 at 217-228. Even construing the evidence in the light most favorable to Gutierrez and accepting her version of the interaction as true, this single comment appears to be neither sufficiently severe nor pervasive enough to establish a nexus between her disability and her termination.

Gutierrez's fourth point—that Marroquin "also had a surgery in January 2016 that was not disability related [and] Marroquin was never subjected to a fitness for duty exam"—is not only conclusory, it is misleading because Gutierrez was also "never subjected" to a fitness for duty exam. ECF No. 28 at 23.

Because there is no evidence in the record supporting Gutierrez's claim that she was terminated on account of her disability, the City is entitled to summary judgment on Gutierrez's disability discrimination claim.

**3. Retaliation**

"A plaintiff establishes a prima facie case of retaliation by showing (i) [s]he engaged in a protected activity, (ii) an adverse employment action occurred, and (iii) there was a causal connection between the protected activity and the adverse employment action." *Hernandez*, 670 F.3d at 657. "A causal [connection] is established 'when the plaintiff shows that the employment decision and [her] protected activity were not wholly unrelated.'" *Cornelius v. Hewlett Packard Enter. Co.*, Civil Action No. 4:16-CV-887, 2017 WL 4653238, at *3 (E.D. Tex. Oct. 17, 2017).

The City contends Gutierrez has failed to demonstrate a causal connection between the protected activity and the adverse action. ECF No. 21 at 9. Gutierrez relies solely on a temporal proximity argument, contending temporal proximity alone is sufficient to demonstrate the causal connection required to make out a prima facie case of retaliation. ECF No. 28 at 17, 33. In support of her temporal proximity argument, Gutierrez relies on a complaint of discrimination made on November 22, 2016. ECF No. 28 at 17. Gutierrez was terminated December 15, 2016. *Id*. at 22.

The evidence shows on June 24, 2009, Gutierrez received a letter of notice for "falsifying records or reports." ECF No. 21-3 at 82. Gutierrez responded to the initial accusation by stating she falsified the record on the directive of her superior. Captain Ramon's letter of notice stated, "[w]hile you may have feared accusation of insubordination if you did not falsify this information, ultimately you are responsible for your own actions. This is unacceptable and any further instances will result in termination." *Id.* The notice went on to inform Gutierrez that if she is asked to do something she believes is illegal or immoral, she should report this up the chain of command. *Id.*

On October 17, 2012, Gutierrez and colleague Delmiro Soliz had a "verbal argument that

quickly escalated and became physical." ECF No. 21-3 at 89. Gutierrez filed a grievance with the City Manager on October 25, 2012. *Id. See also* ECF No. 28-7 at 6. On October 26, 2012, Gutierrez and Soliz each received a one-shift unpaid suspension for "[p]articipation in horseplay or practical jokes, or disorderly conduct of any kind while on work premises or during working hours, including the use of abusive, profane, or threatening language." ECF No. 21-3 at 84. Gutierrez believed equal punishment was unfair because Soliz put his hands on her by grabbing her by the arm and attempting to shove her out the door. *Id.* at 89; 15-16 (Gutierrez Dep. 14:1 – 15:19).

On October 24 and 26, 2014, Gutierrez filed two complaints alleging hostile work environment. ECF No. 21-3 at 89-97. The October 24 complaint identifies the October 17, 2012 incident as the genesis of the hostile work environment. *Id.* at 89. The complaint further alleges that despite her attempts to remediate the situation—including initiating a mediation at which she apologized for her actions during the incident—she did not feel safe on "A" Shift. *Id.* In February 2014, Gutierrez went out on a gunshot suicide call. ECF No. 21-3 at 35 (Gutierrez Dep. 34:2-25). What she witnessed at this call impacted her psychological wellbeing and Gutierrez went on Workman's Compensation for three months. *Id.* When she returned to work in May 2014, she was moved to "B" Shift but the harassment from her "A" Shift colleagues continued. ECF No. 21-3 at 90. The October 26 complaint alleges an incident that occurred during a "B" Shift group breakfast. ECF No. 21-3 at 97. On October 28, 2014, Gutierrez expressed to Assistant Chief Christian that she did not feel safe at work. ECF No. 21-3 at 98. On October 29, 2014, Assistant Chief Christian offered Gutierrez the following options:

> During our meeting yesterday you expressed concerns for your life safety. It was asked of you what accommodations would make you more secure, to which you responded you did not know. To help you feel more confident in your safety we are presenting you with the following options. You are not bound to accept any of

the options, and we are willing to consider any options you may have.

Option 1: You will be issued an Airpak 50 SCBA for your use only, and provided with a lockable cabinet to store your bunker gear and SCBA while not on duty. The locker will be shared with another B-shift employee due to space limitations, of whom you are willing to share the locker with

Option 2: With your acceptance, you will be placed on paid administrative leave until the conclusion of the investigation.

*Id.* Gutierrez accepted Option 2. *Id.* With respect to the October 2014 complaints, Gutierrez asserts "[n]o complaint was ever properly investigated nor was there ever any disciplinary action taken." ECF No. 28 at 24. The City's Motion and the evidence are silent as to the outcome of the investigation into Gutierrez's October 2014 complaints. Neither party indicates at what point Gutierrez returned to work after going on administrative leave on October 29, 2014. The pleadings indicate that Gutierrez returned to work sometime prior to August 2015. ECF Nos. 1 at 4; 21 at 3.

On November 22, 2016, at her pre-disciplinary conference, Gutierrez complained of an incident in February 2016, in which she felt discriminated against. ECF No. 21-1 at 217, 228. Her complaint was immediately investigated. *Id.* at 218-227. Gutierrez was terminated December 15, 2016 for her conduct at the June 26, 2016 respiratory distress call. ECF No. 21 at 11. Prior to the pre-disciplinary conference, Gutierrez knew that her conduct at the June 26, 2016 incident would likely result in discipline.[4] She cannot now rely on a complaint she delayed making for

---

[4] On June 26 and 29, 2016, a member of the Acadian Ambulance crew and a member of the deceased patient's family filed separate complaints against Gutierrez. ECF No. 21-1 at 188-89, 194-96. Gutierrez received copy of the Acadian complaint on July 5, 2016, and the family complaint on August 8, 2016. ECF No. 21-4 at 69. On October 4, 2016, Assistant Chief Christian sent Gutierrez a memo that listed the "rules and procedures your conduct could possibly violate" and invited Gutierrez to respond. ECF No. 21-3 at 106-108. On November 17, 2016, Chief Wendt delivered to Gutierrez a memo notifying her that he had "made a preliminary determination that there was sustained misconduct on your part and contemplate discipline" and inviting her to a meeting on November 22, 2016, "to give you an opportunity to make any statement or present any evidence that you believe I need in order to make a decision regarding the outcome of allegations against you." ECF No. 21-1 at 188-193.

nine months to establish temporal proximity. As shown above, Gutierrez's next most recent complaint of workplace harassment was October 2014, more than two years prior to her termination. Consequently, Gutierrez's temporal proximity argument fails. *See Clark Cty. School Dist. v. Breeden,* 532 U.S. 268, 273-74 (2001) (citing with approval cases finding three-and-four-month periods between protected activity and adverse employment action failed to establish prima facie case under Title VII based on temporal proximity); *Raggs v. Miss. Power & Light Co.,* 278 F.3d 463, 471-72 (5th Cir. 2002) (holding five-month lapse precluded inference of causal link from temporal proximity).

Because there is no evidence in the record supporting Gutierrez's temporal proximity argument, the City is entitled to summary judgment on Gutierrez's retaliation claim.

## IV. CONCLUSION

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 248 (citing Fed. R. Civ. P. 56(e)). To demonstrate more than "some metaphysical doubt as to the material facts," the plaintiff's response to a motion for summary judgment must point to specific facts and must demonstrate "affirmative evidence ... from which a jury might return a verdict in his favor." *Anderson,* 477 U.S. at 257, 261; *see also Matsushita,* 475 U.S. at 586.

In her response, Gutierrez reiterates the same conclusory allegations set forth in her Complaint, and produces no evidence which would raise a genuine issue of material fact regarding the veracity of her allegation that the City discriminated against her based on sex or disability. Even if true, Gutierrez's conclusory statements cannot defeat summary judgment without some evidence which would raise a genuine issue of material fact whether the City

discriminated or retaliated against her. *McKee v. City of Rockwall,* 877 F.2d 409, 415–16 (5th Cir. 1989), *cert. denied,* 493 U.S. 1023 (1990).

For the foregoing reasons, the Court GRANTS IN PART and DENIES WITHOUT PREJUDICE IN PART Defendant City of Converse's Motion for Summary Judgment (ECF No. 21). Plaintiff Crystal Gutierrez's claims for discrimination and retaliation brought pursuant to Title VII, the Americans with Disabilities Act, and the Texas Commission on Human Rights Act are DISMISSED. Defendant's motion for summary judgment on Plaintiff's Equal Pay Act claim is DENIED WITHOUT PREJUDICE.

It is so ORDERED.

SIGNED this 10th day of January 2020.

JASON PULLIAM
UNITED STATES DISTRICT JUDGE